J-A09045-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: J.H.G., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.D-G., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1445 MDA 2022 |

Appeal from the Decree Entered September 14, 2022,
in the Court of Common Pleas of Lancaster County,
Orphans' Court at No(s):  2022-01206.

BEFORE:  PANELLA, P.J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED: MAY 8, 2023**

In this matter, J.D.-G. ("Father") appeals the decree entered by the Lancaster County Orphans' Court, which granted the petition filed by the Lancaster County Children and Youth Social Services Agency ("Agency") and terminated Father's rights to his two-year-old daughter, J.H.G. ("the Child"), pursuant to the Adoption Act. **See** 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).[1]  After review, we affirm.

The record discloses the following factual and procedural history.  The family came to the Agency's attention after the Child was born in January 2020 upon concern for the Child's lack of prenatal care.  At the Child's birth, Mother named Father as the other parent.  Father was incarcerated at the

---

[1] Mother voluntarily relinquished her rights to the Child and is not a party to these proceedings.

time, but he reportedly acknowledged paternity. The Agency's concerns were temporarily allayed when Mother and the Child moved in with the Maternal Grandparents.

Over the next several months, the Agency received reports of Mother's illicit drug use, lack of housing, and incarceration. In August 2020, the juvenile court adjudicated the Child dependent. By the time the court held a dispositional hearing in November 2020, Father had been released. However, his whereabouts were unknown, and a bench warrant had been issued due to a probation violation. The Agency was able to contact Father in January 2021, but Father was unwilling to take a paternity test because of the outstanding warrant. The court ordered the Agency to establish paternity. Father ultimately complied, and his paternity was established in March 2021. His first visit with Child occurred in April 2021.

In June 2021, the juvenile court combined its second permanency review hearing with a dispositional hearing as to Father. Regarding Father, the court ordered a permanency plan, which included the following goals: maintain financial stability; maintain a home free and clear of hazards; improve mental health functioning to the extent he could care for the Child; remain crime free; remain clean and sober from illicit drugs and alcohol; and remain free from domestic violence.

In its Pa.R.A.P. 1925(a) opinion, the orphans' court summarized Father's minimal compliance with his permanency plan throughout the rest of the dependency proceedings:

As to Father's mental health and drug and alcohol goals, the court heard testimony that Father participated in a biopsychosocial evaluation conducted by Lynn Appleby of Jaskot Consulting on August 10, 2021. Ms. Appleby's report recommended that Father undergo anger management classes, parenting classes, and that he enter an intensive outpatient drug and alcohol treatment program with ongoing outpatient care after his completion of the inpatient program. Pursuant to the recommendations of the biopsychosocial evaluation, Father was referred by the Agency to Commonwealth Clinical Group (CCG) for domestic violence classes and counseling. On September 10, 2021, Father completed an intake evaluation at CCG, and it was recommended that he participate in a batterer's intervention group, individual therapy, complete a drug and alcohol evaluation, and attend a parenting program. The Agency was also working with Father to identify appropriate providers and make referrals in order to complete the additional recommendations from the biopsychosocial evaluation report as well as the recommendations from CCG intake evaluation.

Pursuant to the recommendations, on November 19, 2021, the Agency made a referral to CCG for Father to participate in individual mental health therapy and anger management treatment. Father scheduled an intake appointment for those specific therapeutic interventions with CCG for December 16, 2021. He canceled the December 16, 2021 appointment and scheduled the intake appointment for December 27, 2021, which Father again cancelled. Father rescheduled two additional appointments, neither of which he attended. He was a no-show on December 30, 2022, and January 10, 2022. Father was subsequently discharged from CCG.

Father was also referred to PA Counseling for drug and alcohol treatment on November 19, 2021. He failed to attend his November 26, 2021 intake appointment, and was then put on a wait list and asked to call weekly for availability. Father reported that he did not want to wait for PA Counseling and requested the Agency refer him to another provider. On February 11, 2022, Father was referred to Blueprints for drug and alcohol treatment. He was required to schedule his intake appointment but never contacted them. He also had not been drug screened since

August 10, 2021, and he had either failed to comply or show up to attempted drug screens on October 29, 2021, November 5, 2021, November 19, 2021, December 10, 2021, January 1, 2022, and April 1, 2022.

Regarding Father's employment goal, he reported that he was hired at Distinctive Detail of Manheim on January 24, 2022. However, Father later reported that he no longer worked there. At the time of the [termination] hearing, he was not employed.

Regarding his housing goal, Father provided the Agency with a copy of his lease agreement for a single room unit with a communal bathroom. The Agency reported this was not a residence which the Child could return to, and Father reported he was still looking for an appropriate apartment.

Regarding his crime free goal, Father was put on house arrest on January 13, 2022, which ended on April 13, 2022. He was supervised on two separate criminal dockets. During the review period, he did not receive any new charges or probation/parole violations. [2]

Regarding Father's commitment to the Child, he attended his first visit with the Child on April 23, 2021. Due to multiple no-shows/no-calls, Father signed an agreement requiring that he call the Agency at least two hours prior to visit to confirm his attendance. During the review period, he ended his visits early on November 18, 2021, and February 4, 2022. He failed to confirm his attendance on November 19, 2021, December 3, 2021, January 7, 2022, January 14, 2022, January 28, 2022, February 11, 2022, and March 4, 2022, and thus, the visits did not occur. He canceled visits due to a schedule conflict or illness on December 3, 2021, December 6, 2021, December 30, 2021, January 21, 2022, March 18, 2022, March 25, 2022, and April 1, 2022. On February 25, 2022, Father was referred to Bethanna Visitation Services to allow him the opportunity to have community visits as he had requested. He had not yet had a visit at Bethanna due to cancelling scheduled visits on March 18, 2022, March 25, 2022, and April 1, 2022. In general, the Agency reported that Father was inconsistent

_____

[2] On May 28, 2022, approximately three weeks before the termination proceedings, Father was charged with simple assault.

regarding his communication and cooperation with the Agency.

Subsequently, a permanency review hearing was held on April 27, 2022. The court found that there had been minimal compliance with the permanency plan and minimal progress toward alleviating the circumstances necessitating the Child's placement as to Father and progress on all goals was ongoing.

Orphans' Court Opinion, 9/14/22, (O.C.O.) at 4-6 (footnote added).

The Agency filed the termination petition on May 11, 2022. The orphans' court held a hearing as to Father on July 18, 2022; Mother had voluntarily relinquished her rights in June. The court granted the Agency's petition and entered a decree terminating Father's rights, pursuant to Section 2511(a)(1), (2), (5), (8) and (b).

Father timely filed this appeal.[3] He presents the following issues for our review:

1. Whether the Agency produced clear and convincing evidence to terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8).

2. Whether the best interests and welfare of the Child would be served by termination of Father's parental rights[, pursuant to 23 Pa.C.S.A. § 2511(b)].

Father's Brief at 8.

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact

---

[3] The decree was dated July 19, 2022; however, the decree was evidently not filed until September 14, 2022. Father filed a timely notice of appeal on October 13, 2022.

and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 265 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving…the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

*In re C.M.K.*, 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

Critically, we may uphold a termination decision if any proper basis exists for the result reached. *C.S.*, 761 A.2d at 1201. We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Therefore, we review Father's first appellate issue regarding the termination of his rights under Section 2511(a)(2), which provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

[…]

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019) (citation omitted). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). We note that the grounds for termination are not limited to affirmative misconduct like abuse but concern parental incapacity that cannot be remedied. *See id.*

Instantly, the orphans' court determined that the Agency met its burden under Section 2511(a)(2) for the following reasons:

> Father's lack of progress on the key objectives of his plan, as well as his current incarceration and pending criminal charges illustrate that he will not be ready to parent the Child within the next six months. He has not completed the objectives set out by the Agency, and he has not demonstrated the commitment to follow through with the recommended mental health care from his two evaluations. The court believes the 17-month period since Father's

- 8 -

> paternity was confirmed shows an incapacity to care for his Child that has not been remedied, nor can it be in the immediate future. Therefore, this court finds that the Agency proved by clear and convincing evidence that termination of Father's parental rights is warranted under Section 2511(a)(2).

O.O.C. at 13-14.

On appeal, Father first takes issue with the court's reliance on timeframes. He argues that his paternity was not established at the beginning of the Child's dependency case, and thus he maintains that he was not afforded a 17-month period to demonstrate his ability to parent. Father reasons that because his paternity was only established in March 2021 and that his permanency plan goals were not approved until June 2021, Father had less than a year to demonstrate his parental capacity before the Agency filed the termination petition in May 2022. *See* Father's Brief at 19-20.

We are not persuaded by this argument. Unlike subsections (a)(1), (5), and (8), Section 2511(a)(2) does not impose qualifying time constraints. Instead, the Agency must demonstrate that parental incapacity, abuse, neglect, or refusal was repeated and continued; and that the same cannot or will not be remedied. Moreover, the court is not forbidden from considering Father's actions or inaction after the filing of the termination petition. Thus, even if we agreed with Father's temporal argument – that the clock should not have started ticking until June 2021 (when he was put on notice of the court's expectations), Father still had 13 months (from June 2021 until the termination hearing in July 2022) to demonstrate his resolve to reunify with

the Child. The orphans' court did not err or abuse its decision when it concluded that enough time had elapsed for it to render sufficient findings.

Father also argues that the Agency failed to provide sufficient evidence of his inability or refusal to parent. Father argues that while some of his permanency goals were incomplete, there was no basis that these goals should have been instituted in the first place. Moreover, Father claims that his lack of housing or consistent employment should not have been factors in the court's analysis. *See* Father's Brief at 20-21.

We are not persuaded by this argument, either. Father is correct that termination will not be warranted solely on the basis of environmental factors, like inadequate housing or income. *See* 23 Pa.C.S.A. § 2511(b). However, lack of housing or employment were not the primary reasons for the orphans' court's decision. Rather, the orphans' court's determination was based on the fact that Father never followed through with any of the recommended courses of action, whether it be drug and alcohol treatment, mental health treatment, or visitation. Although the record suggests that Father was sometimes proactive in his participation in his permanency plan – as evidenced by his intention to seek a new drug treatment provider rather than be confined to a waitlist – the record also indicates that this was as far as Father would go. He would schedule intake appointments, but then not participate thereafter.

We also find unpersuasive Father's argument that his goals were unnecessary. Father relies on the fact that he participated in one drug and alcohol evaluation, which did not recommend that he receive treatment.

Notably, the Agency did not participate in that evaluation, but Father maintains that, at the termination hearing, the Agency could not say what information it would have given to the evaluator to make her change her mind. *See* Father's Brief at 21. Be that as it may, Father participated in another evaluation during the same month - one that the Agency was able to participate in – and that evaluator did recommend Father receive drug treatment.

To that end, we reiterate that our appellate court function is merely to review the record to see if the evidence supports the lower court's conclusions; it is not our role to search the record for contrary facts or substitute our judgment for that of the lower court. *See also Interest of S.K.L.R.*, 265 A.3d at 1124. In reviewing this record, we discern no error or abuse of discretion. The orphans' court properly determined that the Agency met its burden under Section 2511(a)(2).

Having discerned no error or abuse of discretion as to the first prong of the bifurcated termination analysis, we next address the trial court's findings under Section 2511(b), which Father challenges in his second appellate issue.

That Section provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by

the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

This Court has explained further:

[S]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Concerning the bond, the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship. *See C.M.K.*, 203 A.2d at 264 (citation omitted); *see also K.Z.S.*, 946 A.2d at 764 (holding there was no bond worth preserving where the child had been in foster care for most of the child's life, which caused the resulting bond to be too attenuated). Moreover, the court is not required to use expert testimony to resolve the bond analysis. *In re Z.P.*, 994 A.2d 1108, 1121 (citing *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008)).

"Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***T.S.M.***, 71 A.3d at 268. Finally, we emphasize that "[w]hile a parent's emotional bond with her and/or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted).

The orphans' court explained its reasoning for finding that the Agency also met its burden under Section 2511(b):

> The court heard testimony during the termination of parental rights hearing regarding the Child's stability in her placement, and the ability of the resource family to provide for comfort and the care for the Child's basic needs. The Child was placed in a kinship resource with her maternal half-sibling who had been previously adopted by the [Kinship Family]. The Child was placed in the home in [late November] 2020 when she was six months old. Since placement, the Agency reported that she has been doing well with her resource family. The Agency caseworker testified that she sees her foster parents as [her mom and dad], she's very comfortable and affectionate around them, and she seeks them out for comfort whenever she needs. She has been getting regular well[ness] checks and is up to date on her vaccines. Additionally, she was evaluated with Early Intervention and received physical therapy as well as speech/social/emotional therapy. The resource mother reported that the Child had completed physical therapy in September 2021 and remains in the tracking program with Early Intervention. The Child also maintains contact with her maternal grandparents, who provided childcare early in the Child's life, but were unable to be a permanent placement option. [The guardian *ad litem* (GAL)] stated that she agreed with the Agency's request to terminate Father's

parental rights. She further stated that the Child is with a family that loves her, she considers them her parents, and it would not be fair to put the Child's life on hold while Father continues to work out his issues with domestic relations and involvement in the criminal justice system.

The court did not hear testimony regarding the Child's attachment to Father. However, the young age of the Child, the lack of contact with Father since the Child's birth clearly illustrate that there has not been an opportunity for the Child to develop a meaningful attachment with Father. Since Father was given a plan, he failed to maintain consistent contact with the Agency and would routinely either cancel his visits or simply fail to appear for the visits. Although it was reported that Father was affectionate and played with the Child well, his sporadic attendance, and his periods of incarceration during the Child's life, have made it virtually impossible for him to develop a parental bond with his Child. Give the Child's young age, and the importance of the early years in a Child's life, particularly the importance of establishing parental relationships, the Court finds that the Child does not have an attachment to Father. The Court also finds that it is not likely that Father would be able to establish a meaningful attachment with the Child soon, especially given his failure to take advantage of the visitation, particularly community visits, offered during his short period at Bethanna Visitation Services. At present, the Child's welfare is best served by terminating the parental rights of Father.

O.O.C. at 15-17.

On appeal, Father presents a narrow challenge, namely that the orphans' court conflated the Section 2511(a) analysis with the Section 2511(b) analysis. Father explains that the only evidence supporting termination under Section 2511(b) was "limited to one paragraph of testimony by the caseworker," who testified about the relationship between the Child and the Kinship Family. The caseworker stated that termination would be in

the Child's best interest because Father demonstrated that he was not able or willing to comply with the plan. **See** Father's Brief at 24 (citing N.T., 7/18/22, at 25). According to Father, evidence of his compliance with the permanency plan, or lack thereof, was relevant only to the 2511(a) analysis – and that the Section 2511(b) analysis required an entirely different inquiry. ***Id.*** Father concludes that the Agency failed to meet its burden.

We disagree. We acknowledge that these analyses differ in their focus; Section 2511(a) concerns the conduct of the parent, whereas Section 2511(b) focuses on the needs and welfare of the Child. **See C.M.K.**, 203 A.3d at 261-62. But Father fails to appreciate how his conduct (relevant to Section 2511(a)) affects the Child's needs and welfare (relevant to Section 2511(b)). For instance, because of Father's conduct – e.g., his inability to provide parental care and his failure to visit the Child – the Child developed a primary attachment to the Kinship Parents. The evidentiary record of Father's conduct also reveals the Father's failure to provide the Child with the those "intangibles" at the center of the Section 2511(b) inquiry – *i.e.*, stability, security, love, and comfort. Given Father's conduct, the orphans' court could properly find that the Kinship Parents – not Father – met the Child's needs and welfare, and that termination would not sever any parental bond worth preserving. Thus, although the focus of these statutory inquiries is different, they stem from the same factual predicate. Father's second appellate issue merits no relief.

In sum, upon review of the orphans' court's decision to terminate Father's parental rights under Section 2511(a)(2) and (b), we discern no error or abuse of discretion.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/8/2023